## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

DENNIS SCOTT, CHAD
DRIGGERS, DOUGLAS WILLIS,
and GEORGE ROWLAND,

        Plaintiffs,

     v.                           Case No.: 6:22-cv-2192

CITY OF DAYTONA BEACH,
FLA.,

        Defendant.

_____/

## COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF AND DAMAGES

### INTRODUCTION

1.    Plaintiffs DENNIS SCOTT, CHAD DRIGGERS, DOUGLAS WILLIS, and GEORGE ROWLAND, all individuals experiencing poverty, bring this suit to challenge a municipal ordinance enacted by Defendant City of Daytona Beach (hereinafter, "City" or "Defendant") that restricts their ability to request charity within the City by criminalizing the content of their speech. Plaintiffs reside (or resided at all pertinent times) in the City, and hold signs with messages conveying their need for assistance from vehicles on public roadways, stand on public sidewalks making verbal requests for assistance to passersby throughout the City, or offer tokens such as palm frond roses in exchange for donations.

2.    The City adopted § 66-1, Code of Ordinances, City of Daytona Beach,

Florida ("City Code"), a content-based ordinance prohibiting speech soliciting charitable assistance in many areas within the City, including the boardwalk, and within twenty feet of bus stops, trolley stops, ATMs, parking garages, parking meters, outdoor dining areas, public restrooms, along the side of the road, and several other locations. The City further prohibits charitable solicitations during certain time periods - from a half hour after sunset until one half hour before sunrise, as well as charitable solicitation that is deemed "aggressive." (Certified Copy attached as Ex. 1.)

3.      A person seeking to engage in other forms of speech under similar circumstances as those seeking charity – such as asking for votes, requesting signatures on a petition, encouraging people to join a church – may do so without impunity or fear of arrest. Because § 66-1 restricts certain types of speech, it is content-based and subject to strict scrutiny. Further, because it is not narrowly tailored to any compelling government interest, nor is it the least restrictive means of advancing any governmental interest, it is an unconstitutional restriction on free speech.

4.      The City's adoption and enforcement of § 66-1 of the City Code (hereinafter, "Ordinance" or "challenged provisions") hinders Plaintiffs' exercise of their First Amendment rights and subjects them to a continued threat of arrest for their protected speech causing them to suffer damages.

5.      Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 for violations of their First Amendment rights under the United States Constitution.

6.      Plaintiffs challenge the constitutional validity of the Ordinance, both

2

facially and as applied to them by Defendant and its agents who are engaging in state functions pursuant to official policy, practice, or custom of the City.

7.     Plaintiffs challenge only those provisions of the Ordinances that apply to traditional public forums and do not challenge the private property provision contained in City Code § 66-1(c)(2).

8.     Plaintiffs seek injunctive relief against future enforcement of the Ordinance, declaratory relief, and damages against the City for injuries caused by the enforcement and violations to their First Amendment rights.

## JURISDICTION

9.     This action seeks declaratory and injunctive relief and damages pursuant to 42 U.S.C. § 1983 for past and ongoing injury to Plaintiffs' First Amendment rights.

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## VENUE

11.     Venue is proper in the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. § 1391(b).  Plaintiffs reside (or resided at all pertinent times), and all of the acts and omissions complained of herein occurred and will continue to occur, in the Orlando Division of the Middle District of Florida.

## PLAINTIFFS

12.     Plaintiff DENNIS SCOTT is a resident of Daytona Beach, Florida, and has lived in the City for about one year. He is a person with a disability who currently

does not have permanent housing. He frequently sleeps in public parks or other public areas in the City. SCOTT solicits donations from passersby, including basic necessities such as food, water, clothing, hygiene products, and sometimes cash. At the direction of the City, Daytona Beach Police have repeatedly warned SCOTT for sitting in his wheelchair holding signs soliciting charitable donations on public sidewalks next to roadways in the City. As a result, and because of his fear of arrest and prosecution for a violation of the Ordinance, SCOTT has reduced the time and frequency during which he solicits donations in the City. He wants and needs to continue to solicit donations for his survival.

13.     Plaintiff CHAD DRIGGERS is a resident of Daytona Beach, Florida, and has resided in the City for 9 years. He currently does not have permanent housing. He frequently sleeps in public parks or other public areas in the City. DRIGGERS solicits donations from passersby, including basic necessities such as food, water, clothing, hygiene products, and sometimes cash. At the direction of the City, Daytona Beach police have repeatedly warned and arrested DRIGGERS for holding out his hat toward drivers in vehicles while standing on the median or sidewalks next to public roadways in the City. Daytona Beach Police have told DRIGGERS to move to another side of the street so that he is no longer standing within the City limits in order to avoid arrest. DRIGGERS has been arrested 5 times under the Ordinance for holding signs requesting charitable donations in the City. As a result, and because of his experience of arrest and prosecution from City police for a violation of the Ordinance,

DRIGGERS has reduced the frequency with which he solicits donations in the City and on occasion will relocate his practices for soliciting for donations to outside the City limits for fear of prosecution. He wants and needs to continue to solicit donations for his survival.

14.     Plaintiff DOUGLAS WILLIS is currently a resident of Daytona Beach, Florida. WILLIS has resided in Volusia County for over 13 years. He does not have permanent housing at this time. He frequently sleeps in public parks or other public areas. WILLIS has been warned and told to move along by Daytona Beach Police officers while holding a sign asking for charity along roadways in the City. As a result, and because of fear of arrest and prosecution for a violation of the Ordinance, WILLIS has significantly reduced the frequency with which he solicits donations in the City and has limited his approach to oral requests without a sign because of fear of arrest and prosecution. He wants and needs to continue to solicit donations for his survival.

15.     Plaintiff GEORGE ROWLAND is a resident of Volusia County, Florida and lives near Daytona Beach, Florida. He recently began renting a shared room in the County; prior to finding his current living arrangement, he resided in the City for over 11 years. When he did not have permanent housing, he would sleep in public parks or other public areas outdoors in the City. City police have repeatedly warned ROWLAND, under threat of arrest, for holding roses made from palm fronds while asking for money or other help from drivers in Daytona Beach. Daytona Beach Police have told ROWLAND to move to a location outside of the City in order to avoid

arrest. As a result, and because of the threat of arrest and prosecution from City police for a violation of the Ordinance, ROWLAND has reduced the frequency with which he solicits for donations in the City and has relocated his practices of soliciting for donations to outside the City limits. He wants and needs to continue to solicit donations for his survival.

**DEFENDANT**

16.     The City of Daytona Beach is a municipal entity organized under the laws of the State of Florida with the capacity to sue and be sued.

17.     The City Commission sets final policy on the creation and adoption of City ordinances.

18.     City ordinances, including the challenged Ordinance, are official policies of the City of Daytona Beach.

19.     The City is the legal entity responsible for the police department known as the City of Daytona Beach Police Department ("City Police").  City Police have the traditional authority of police forces to enforce Florida statutes and City ordinances.

20.     The City is sued for injunctive and declaratory relief and damages, on the basis of acts of officers, agents, and employees of the City taken pursuant to official policy, practice, or custom.

21.     At all times relevant to this complaint, Defendant and their police officers, employees, and agents, were acting under color of state law.

**FACTUAL ALLEGATIONS**

6

**The City's Ordinance**

22.     On February 6, 2019, the City Commission adopted Ordinance No. 19-27, an ordinance regulating panhandling and soliciting, codified at § 66-1 of the City Code.  (Ex . 1.)

23.     The Ordinance defines "panhandle" to mean:

> to beg or make any demand or request made in person for an immediate donation of money or some other article of value from another person for the use of one's self or others, including but not limited for a charitable or sponsor purpose or that will benefit a charitable organization or sponsor. As used in this article, the word "solicit" and its forms are included in this definition. Panhandling is considered as having taken place regardless of whether the person making the solicitation received any contribution. Any purchase of an item for an amount far exceeding its value, under circumstances where a reasonable person would understand that the purchase is in substance a donation, constitutes a donation as contemplated in this definition. Begging is included in this definition of Panhandling. Soliciting is included in this definition of Panhandling.

(Ex. 1, § 66-1(b).)

24.     The ordinance requires an individual City Police officer to examine the content of a person's speech to determine if they have made a prohibited "demand or request."

25.     Charitable solicitation is a form of expression that is protected under the First Amendment of the U.S. Constitution, whether the solicitation is for one's personal needs or made charitably on behalf of other recipients.

26.     Public sidewalks, streets, parks, and medians are traditional public fora.

27.     The Ordinance prohibits charitable solicitation by individuals on traditional public fora in the City.

7

28.     Other forms of speech or expression not involving charitable solicitation are not prohibited, making the Ordinance a content-based restriction on speech in traditional public fora and presumptively unconstitutional.

29.     Section 66-1 contains four types of regulations of speech: speech restrictions based on location, § 66-1(c)(3), (c)(4)(b)-(d); speech restrictions during certain times of day, § 66-1(c)(4)(i); traffic-related restrictions on speech, § 66-1(c)(3)(g), (4)(a); and restrictions on speech in connection with other conduct, § 66-1(c)(4)(a), (e)-(h). (Ex. 1.)

*Location Restrictions*

30.     The Ordinance forbids panhandling "when either the person engaged in Panhandling or the panhandler or the person being panhandled, is located in, on or at the following locations:

> (a) within twenty (20) feet, in any direction, from any entrance or exit of commercially zoned property, including restaurant drive-ins;
>
> (b) within twenty (20) feet, in any direction, of any bus or trolley stops or any public transportation facility;
>
> (c) within twenty (20) feet, in any direction, of an automated teller machine or any electronic information processing device which accepts or dispenses cash in connection with a credit, deposit or convenience account with a financial institution;
>
> (d) within twenty (20) feet, in any direction, of any parking lot, parking garage, parking meter or parking pay station owned or operated by the City;
>
> (e) within twenty (20) feet, in any direction, of any public restroom owned and operated by a governmental agency;

(f) within one hundred (100) feet, in any direction, of any daycare or school, including pre-kindergarten through grade 12;

…

(h) occurring on the Boardwalk as defined by the Map attached hereto as Exhibit A."

(Ex. 1, § 66-1(c)(3).)

31.     The Ordinance further prohibits panhandling, soliciting or begging at the following locations:  "any lawfully permitted outdoor dining area amphitheater [sic], amphitheater seating area, playground or lawfully permitted outdoor merchandise area, provided such areas are in active use at the time," § 66-1(c)(4)(b), "at any transit stop or taxi stand or in a public transit vehicle," § 66-1(c)(4)(c), or while the person or persons being solicited is standing in line waiting to be admitted to a commercial establishment," § 66-1(c)(4)(d). (Ex. 1.)

32.     Individuals are otherwise permitted to be physically present in these same locations so long as they refrain from uttering prohibited speech.

33.     The prohibited zones and locations are generally located in traditional public fora.

*Restrictions Based on Time of Day*

34.     The current panhandling ordinance restricts begging, soliciting, or panhandling on any day after dark. (Ex. 1 § 66-1(c)(4)(i).) "After dark" is defined in the ordinance as "one half hour after sunset until one half hour before sunrise" as

established "by the times listed in any local publication of general distribution." (Ex. 1, § 66-1(b)(1).)

35.    Section 66-1(c)(4)(i) prohibits all requests for charity, throughout the entire city, for an average of approximately eleven hours a day throughout the year. On shorter days during October to January, requests for charity are prohibited throughout the City for an average of twelve and a half hours per day.

36.    The City does not otherwise impose a curfew for individuals after dark or prohibit other types of speech after dark.

37.    There is nothing inherently unsafe or dangerous about requests for charity that take place after dark.

*Traffic-Related Restrictions*

38.    The ordinance prohibits panhandling within 150 feet "of any signalized intersection of: 1) arterial roads; 2) collector roads; and 3) arterial and collector roads," § 66-1(c)(3)(g), and approaching "an operator or other occupant of a motor vehicle for the purpose of panhandling, … if such panhandling is done in an aggressive manner," § 66-1(c)(4)(a). (Ex. 1.)

39.    The City has other mechanisms by which it can address concerns about pedestrians and traffic safety.

40.    For instance, the City may enforce state traffic laws governing pedestrians in roadways. *See* § 316.130, Fla. Stat. (2021) (regulating pedestrians in

traffic); § 316.2045, Fla. Stat. (2021) (making it a pedestrian violation to willfully obstruct the free, convenient, and normal use of a public street, highway, or road").

41.     The City may also enforce a city ordinance that prohibits obstructing pedestrian or vehicular traffic. *See* § 86-38, City Code (prohibiting any person from "knowingly obstruct[ing] any public street, public highway, public sidewalk or any other public place or building by hindering or impeding … the free and uninterrupted passage of vehicles, traffic or pedestrians").

*Conduct-Related Restrictions*

42.     The ordinance prohibits panhandling, soliciting, or begging "while under the influence of alcohol or having illegally used any controlled substance." (Ex. 1, § 66-1(c)(4)(h).).

43.     There are laws prohibiting "disorderly intoxication" that already cover behavior that is disruptive and harmful to the public. § 856.011, Fla. Stat. (2021).

44.     The ordinance also prohibits "approach[ing] an operator or other occupant of a motor vehicle for the purpose of panhandling, soliciting or begging, or offering to perform a service in connection with such vehicle, or otherwise soliciting the sale of goods or services" if done in an "aggressive manner." (Ex. 1, § 66-1(c)(4)(a).)

45.     The ordinance defines "aggressive panhandling" as follows:

> a.     To approach or speak to a person and demand, request or beg for money or a donation of valuable property in such a manner as would cause a reasonable person to believe that the person is being threatened with imminent bodily injury or the commission of a criminal act upon the person approached or another person in the solicited person's company, or upon property in the person's

immediate possession (for example, placing oneself within 2 feet of a solicited person and/or using abusive or profane language in a loud voice while demanding or requesting money); or

b.      To maintain contact with a solicited person and continue demanding, requesting or begging for money or a donation of valuable property after the solicited person has made a negative response to an initial demand or request for money or a donation (for example, walking in front of, next to, or behind a solicited person while continuing to demand, request or beg for money from that person after that person has refused to donate or give money); or

c.      To obstruct, block or impede, either individually or as part of a group of persons, the passage or free movement of a solicited person or a person in the company of a solicited person, including persons on foot, on bicycles, in wheelchairs or operating motor vehicles or persons attempting to enter or exit motor vehicles (for example, walking, standing, sitting, laying, or placing an object in such a manner as to block passage of another person or vehicle, or to require another person or driver of a vehicle to take evasive action to avoid physical contact); or

d.      To touch or cause physical contact to a solicited person or a person in the company of a solicited person, or to touch any vehicle occupied by a solicited person or by a person in the company of the solicited person, without the person's express consent; or

e.      To engage in conduct that would reasonably be construed as intended to intimidate, compel or force a solicited person to accede to demands.

(Ex. 1, § 66-1(b)(2).) Other provisions of the ordinance prohibit panhandling, soliciting or begging "by touching the person or persons being solicited without that person's consent," § 66-1(c)(4)(e), and panhandling, soliciting or begging "with the use of profane or abusive language," § 66-1(c)(4)(f), throughout the City. (Ex. 1.)

12

46.     The ordinance's definition of "aggressive panhandling" includes descriptions of behavior that are not inherently aggressive; for example, standing in close proximity ("within 2 feet") to a person while requesting money, § 66-1(b)(2)(a), making an additional request for money or a donation after receiving a negative response, § 66-1(b)(2)(b), or blocking the path of another so as to require "evasive action to avoid physical contact," § 66-1(b)(2)(c). (Ex. 1.)

47.     The current panhandling ordinance's "aggressive panhandling" provisions prohibit the person from making a request for money from explaining why they need the money, trying to convey a longer message to the person being solicited, or attempting to make their request a second time. (Ex. 1, § 66-1(b)(2)(b).)

48.     The ordinance's "aggressive panhandling" provisions prohibit requests for money or a donation of valuable property in public forums when engaging in another form of protected speech, the use of profane language. (Ex. 1, §§ 66-1(b)(2)(a), (c)(4)(f).)

49.     The current panhandling ordinance's "aggressive panhandling" provisions prohibit solicitation when accompanied by conduct that would otherwise be a crime under Florida statutes; for example, touching a solicited person without consent, which constitutes battery under § 784.03, Fla. Stat., or using threatening or coercive language or conduct, which could be charged as assault under § 784.011, Fla. Stat. (2019) or disorderly conduct/breach of the peace under § 877.03, Fla. Stat. (2019). (Ex. 1, §§ 66-1(b)(2)(a), (b)(2)(d)-(e), (c)(4)(e),).

50.     The Ordinance makes conduct that is already punishable by other criminal statutes, such as assault and battery, subject to additional penalties because of its connection to protected speech.

51.     The Ordinance regulates expression that is protected by the First Amendment. Even an alleged "aggressive" panhandler conveys messages related to need and deprivation.

### The City's Justifications for the Ordinance

52.     Section 66-1(a) and the "Whereas" clauses to Ordinance No. 19-27 assert the City's purported interests in adopting the Ordinance.

53.     The City's purported interests for enacting the Ordinance include that "panhandling and begging throughout the City has become extremely disturbing and disruptive to residents and businesses, and has contributed not only to the loss of access to and enjoyment of public places but also to an enhanced sense of fear, intimidation, and disorder as well as actual danger to the health, safety and welfare of citizens and tourists alike." (Ex. 1.)

54.     Section 66-1(a) asserts that the City, in enacting the Ordinance, has "an overriding compelling governmental interest to protect the health, safety, and welfare of the citizens of Daytona Beach and visitors from the adverse secondary effects of solicitation, including panhandling and begging, in public areas" and that "certain behaviors attributed to panhandlers including but not limited to open urination and open defecation and the blockage of ingress and egress into and from commercial

businesses and other public areas as well as the impedance of pedestrian walkways and other public rights of way implicates the compelling governmental interest of Daytona Beach in protecting the health, safety and welfare of its citizenry and visitors in preserving police and fire department access to such rights of way in order to save lives." *Id.*

55.     The City also claims the following significant interests in adopting the Ordinance: "providing a safe and pleasant environment and eliminating nuisance activity"; "preserving the safety of traffic flow and preventing traffic congestion"; "the safety of pedestrians and individuals traveling in vehicles"; "promoting tourism and aesthetics"; "promoting the safety and convenience of its citizens on public streets" and sidewalks; "ensuring the public safety and order and in promoting the free flow of traffic on public streets and sidewalks"; "controlling traffic and pedestrian congestion"; "preventing crime, protecting the City's retail trade, maintaining property values, and generally protecting and preserving the quality of the City's neighborhoods, commercial districts and the quality of urban life"; and "maintaining safe ingress and egress to commercial establishments." *Id.*, at 3-5.

56.     The City's purported interests as articulated in the Ordinance are not compelling.

57.     The City has not articulated any real and non-speculative harm to justify the suppression of protected speech.

58.     The City did not undertake to address the problems it identified with less

intrusive tools readily available.

## Enforcement of the City's Ordinance

59.     When Plaintiffs and other homeless individuals stand on public sidewalks and streets and hold signs or make verbal requests for charitable donations, they raise public awareness about the plight of homeless individuals in and around the City.

60.     The Ordinance prohibits all requests for charity, whether they are verbal, non-verbal, or by holding a sign or engaging in expressive conduct throughout many parts of the City during a significant portion of the day.

61.     Penalties for violating the Ordinance are set forth in § 66-1(d), which provides for punishments in a manner prescribed in § 1-14 of the City Code, which allows for the imposition of "a fine not exceeding five hundred dollars ($500.00) or imprisonment for a term not exceeding sixty (60) days, or by both a fine and imprisonment." In addition, court costs of up to $200 are assessed for violations resulting in a disposition of guilty or adjudication withheld.

62.     Since the Ordinance was enacted on February 6, 2019, City police have made approximately 240 arrests for violations of § 66-1.

63.     Of these 240 arrests, 228 resulted in custodial arrests where the individual being charged was immediately taken to jail.

64.     Of these 240 arrests, approximately 200 were arrests of individuals experiencing homelessness, who used a homeless shelter as an address, or who did not

have a home address listed on their arrest report.

65.     Of these 240 arrests, approximately 42 were made by undercover or plain-clothes officers.

66.     Individuals exercising their First Amendment right to request charity have spent approximately 1,123 nights in jail and been assessed approximately $18,700 in court costs, fees and fines after being arrested for violations of the Ordinance.

67.     City police also threaten individuals making requests for charity with arrest and issue verbal warnings for panhandling, telling people what they are doing is unlawful and to move along.

**Facts Concerning Individual Plaintiffs**

**Dennis Scott**

68.     Plaintiff SCOTT has lived in the City for one year.

69.     SCOTT does not have a fixed address, and when he cannot find a place to sleep inside, he sleeps outside in public areas.

70.     Due to a disability, SCOTT cannot work at a traditional job.

71.     SCOTT engages in charitable solicitation on public sidewalks, on I-95 off ramps, or in public areas frequented by drivers near businesses in the International Speedway area of the City, holding a small sign that usually says "Hard times. Hungry and homeless" or something similar.

72.     SCOTT intends his sign to convey to passersby that he needs help. Plaintiff wants to express that he is hungry and does not want to be invisible.

73.     SCOTT typically receives food, care packages containing water, hygiene products and clothing items, or gift cards.  Sometimes, passersby give SCOTT cash.

74.     SCOTT has regularly been warned by City police that he cannot ask for charity.   SCOTT has been told that he is violating the Ordinance prohibiting panhandling.  SCOTT has been told by Daytona Beach Police that he cannot sit in his wheelchair alongside public streets, medians, or sidewalks and ask for help using his sign in the City.

75.     SCOTT was told by a Sergeant of the Daytona Beach Police Department that he would assign an officer to photograph SCOTT while he held his sign on a public sidewalk in order to arrest him and charge him individually in violation of the Ordinance for each donation he received so that he would not be able to afford his bond and he would be held in jail longer.

76.     In November 2022, SCOTT moved from where he was holding his sign at the off-ramp to I-95 after seeing an officer with the Daytona Beach Police Department because he feared arrest. After leaving this location, the officer approached SCOTT and said that he would have been arrested for being in violation of the panhandling ordinance had he not moved along.

77.     As a direct consequence of the enforcement actions taken by Defendant pursuant to the Ordinance, SCOTT has been chilled in the exercise of his constitutionally protected rights to free speech and expression in quintessential public fora.

78.     SCOTT continues to hold signs on public sidewalks and in public areas near businesses in the City as a means of communicating with fellow citizens.  He is concerned that he will continue to suffer the same violations of his rights and that he will be prevented from doing so by being threatened with arrest, cited, and/or arrested by City police and/or their agents under the Ordinance.

79.     As a result, and because of his fear of arrest and prosecution for a violation of the Ordinance, SCOTT has relocated and reduced the frequency with which he solicits donations in the City.

80.     SCOTT would like to continue to ask for charity without risking arrest.

### Chad Driggers

81.     Plaintiff DRIGGERS has lived in the City for 9 years.

82.     DRIGGERS does not have a fixed address, and when he cannot find a place to sleep inside, he sleeps outside in public areas.

83.     DRIGGERS does not have a traditional job.

84.     DRIGGERS engages in charitable solicitation on public sidewalks and medians in public areas frequented by drivers stopped at red lights in the Mason Avenue area of the City, holding signs or holding out his hat as a signal to request donations from drivers.

85.     DRIGGERS intends his signs and signals to convey to passersby that he is in need of help. Plaintiff has been able to make friends with passersby or accept job offers while requesting charitable donations. Plaintiff feels that he has become a part

of the community of Daytona Beach as a result.

86.     DRIGGERS typically receives food, care packages containing water, hygiene products and clothing items, or gift cards.   Sometimes, passersby give DRIGGERS cash.

87.     DRIGGERS has regularly been warned by City police that he cannot ask for charity alongside public streets, medians, or sidewalks and ask for help using his hat in the City. DRIGGERS has been told by Daytona Beach Police that he cannot stand alongside public streets, medians, or sidewalks and ask for help using his hat in the City.

88.     DRIGGERS has been arrested 5 times for violating the Ordinance while requesting charity on public sidewalks. One of these charges was dismissed. Currently (as of November 28, 2022), DRIGGERS has had $458 in court fees levied against him, all of which he cannot afford to pay and must solicit charitable donations to meet his basic needs. DRIGGERS has been sentenced to 10 days in jail for violations of the Panhandling Ordinance. He has served an additional 24 days in jail on other charges resulting from a panhandling arrest.

89.     As a direct consequence of the enforcement actions taken by Defendant pursuant to the Ordinance, DRIGGERS has been chilled in the exercise of his constitutionally protected rights to free speech and expression in quintessential public fora.

90.     DRIGGERS continues to hold out his hat on public sidewalks and

medians in public areas of the City as a means of communicating with fellow citizens. He is concerned that he will continue to suffer the same violations of his rights and that he will be prevented from doing so by being threatened with arrest, cited, and/or arrested by City police and/or their agents under the Ordinance.

91.     As a result, and because of his fear of arrest and prosecution for a violation of the Ordinance, DRIGGERS has relocated and reduced the frequency with which he solicits donations in the City.

92.     DRIGGERS would like to continue to ask for charity without risking arrest.

### Douglas Willis

93.     Plaintiff WILLIS has lived in Volusia County for 13 years and has been a resident of Daytona Beach for approximately 5 years.

94.     WILLIS does not have a fixed address, and when he cannot find a place to sleep inside, he sleeps outside in public areas.

95.     Due to a disability, WILLIS cannot work at a traditional job.

96.     WILLIS engages in charitable solicitation on public sidewalks, or in public areas frequented by pedestrians in the Boardwalk area of the City. He usually asks passersby if they could "Spare any change" or "Spare any food?" or something similar. WILLIS only makes verbal requests in order to be less visible by the City police.

97.     WILLIS intends his verbal requests to convey to passersby that he is in

need of help. Plaintiff wants to express that he is very grateful to others' generosity.

98.     WILLIS typically receives food, care packages containing water, hygiene products and clothing items, or gift cards.  Sometimes, passersby give WILLIS cash.

99.     WILLIS used to hold a sign on A1A near the beach in the City, holding a sign that read, "The Earth is a flat circle with a square foundation." WILLIS stopped holding his sign a few years ago after an incident in or around March of 2019, when an officer with the Daytona Beach Police Department took his sign from him.

100.     WILLIS has been warned against asking for charity by the Daytona Beach police and has observed others being arrested for violating the Ordinance.

101.     As a direct consequence of the enforcement actions taken by Defendant pursuant to the Ordinance, WILLIS has been chilled in the exercise of his constitutionally protected rights to free speech and expression in quintessential public fora.

102.     WILLIS continues to make verbal requests on public sidewalks and in public areas near businesses in the City as a means of communicating with fellow citizens.  He is concerned that he will continue to suffer the same violations of his rights and that he will be prevented from doing so by being threatened with arrest, cited, and/or arrested by City police and/or their agents under the Ordinance.

103.     As a result, and because of his fear of arrest and prosecution for a violation of the Ordinance, WILLIS has changed the method and reduced the frequency with which he solicits donations in the City.

104.     WILLIS would like to continue to ask for charity without risking arrest.

**George Rowland**

105.     Plaintiff ROWLAND has lived in the City for 11 years.

106.     ROWLAND recently obtained housing in a shared room in Volusia County. Prior to that, he would sleep outside in public areas.

107.     ROWLAND does not work at a traditional job.

108.     ROWLAND engages in charitable solicitation on public sidewalks alongside roads frequented by drivers in the Mason and Ridgewood area of the City, holding roses he made from palm fronds toward vehicles stopped at the nearby traffic light.

109.     ROWLAND intends his charitable solicitation to convey that he needs a little help. Plaintiff believes people understand the symbolic message of holding out palm fronds.

110.     ROWLAND typically receives food, care packages containing water, hygiene products and clothing items, or gift cards.  Sometimes, passersby give ROWLAND cash.

111.     ROWLAND has regularly been warned by City police that he cannot ask for charity.  ROWLAND has been told that he is violating the Ordinance prohibiting panhandling, and that he cannot stand alongside public streets, medians, or sidewalks and ask for help using his sign in the City.

112.     As a direct consequence of the enforcement actions taken by Defendant

pursuant to the Ordinance, ROWLAND has been chilled in the exercise of his constitutionally protected rights to free speech and expression in quintessential public fora.

113.   ROWLAND continues to hold palm frond roses on public sidewalks as a means of communicating with fellow citizens and would like to be able to resume asking for help in the City.  He is concerned that he will continue to suffer the same violations of his rights and that he will be prevented from doing so by being threatened with arrest, cited, and/or arrested by City police and/or their agents under the Ordinance.

114.   As a result, and because of his fear of arrest and prosecution for a violation of the Ordinance, ROWLAND has had to relocate his practice of asking for help to a neighboring City and reduced the frequency with which he solicits donations in the City.

115.   ROWLAND would like to continue to ask for charity without risking arrest.

**CLAIM FOR RELIEF**
**THE PANHANDLING ORDINANCE VIOLATES**
**THE FIRST AMENDMENT TO THE U.S. CONSTITUTION**

116.   The allegations of paragraphs 1 through 115 are incorporated into the Claim for Relief as though fully set forth herein.

117.   The challenged provisions of the Ordinance, codified in §§ 66-1(c)(1) and 66-1(c)(3) – (4), are an unconstitutional infringement, on their face and as applied to

Plaintiffs, of Plaintiffs' affirmative rights to freedom of speech and expression secured by the First Amendment to the U.S. Constitution.

118.    At all times relevant hereto, the Daytona Beach City Commission was the final policymaker for the City for the purpose of adopting ordinances regulating constitutionally protected speech, expressive conduct, and assembly within the boundaries of the City.

119.    Requests for donations are recognized as speech entitled to First Amendment protection.

120.    The City's streets, sidewalks, medians, and roadways are traditional public fora that hold a special position in terms of First Amendment protection because of their historic role as places of discussion and debate.

121.    The challenged Ordinance restricts protected speech on traditional public forums throughout the City including public streets, sidewalks, medians, and parks.

122.    The Ordinance is an impermissible content-based restriction on speech. The ordinance seeks to limit constitutionally protected speech and manners of expression, as it singles out one subject area of speech - charitable solicitation - for different treatment than speech on other subject matter.

123.    A determination as to whether an individual is violating the ordinance requires a law enforcement officer to examine the content of a person's speech.

124.    As a content-based regulation, the Ordinance is subject to strict scrutiny, requiring the City to show that this regulation is narrowly tailored to serve a

compelling government interest and is the least restrictive means of serving that interest.

125.    The City's purported interests in preserving access to and enjoyment of public spaces, protecting commercial interests and aesthetics, and preventing people and businesses from "disturbing or disruptive" speech are not recognized as compelling interests under the First Amendment to justify content-based restrictions on speech.

126.    There is no compelling government interest that is furthered by these content-based restrictions on speech.

127.    The City's purported interest in protecting the health, safety, and welfare of its citizens and visitors from health hazards allegedly spread by the hygiene habits of alleged panhandlers is not compelling. Even assuming the City's interests were compelling, the City must still proffer evidence that this is an actual, and not speculative, issue.

128.    Even if the City had a non-speculative compelling interest, the Ordinance fails strict scrutiny. An ordinance that prohibits charitable solicitation is not narrowly tailored to addressing the risk of infectious disease. It is over-inclusive in that it suppresses speech that is unrelated to health or safety concerns, and under-inclusive in that it does not actually address the behaviors that are cited as a concern.

129.    The City's purported interest in maintaining safe ingress and egress of commercial businesses and public areas to preserve police and fire department access

to rights of way is not furthered by censoring only certain messages expressed by as few as one individual in a traditional public forum.

130.     The Ordinance is over-inclusive, in that it sweeps into its ambit protected speech that poses no threat such as asking for money after dark, while on a median, or while standing within 20 feet of an exit or entrance to a commercially zoned building.

131.     The Ordinance is also under-inclusive, in that it singles out solicitation from other types of speech, such as protest, that would be equally dangerous if it were to create a traffic hazard.

132.     There is nothing inherently dangerous about initiating a conversation on a public street to ask for assistance or holding a sign requesting charity.

133.     The City has means readily available to it to address its purported interests that do not infringe upon protected speech.

134.     The Ordinance makes conduct that is already punishable by state statute and other provisions of the City Code subject to additional penalties because of its connection to protected speech.

135.     The City has other mechanisms by which it prohibits conduct presenting a traffic hazard. Ordinances prohibiting the obstruction of rights of way already restrict behavior hindering the safe movement of traffic without intruding on protected speech.

136.     The City has other mechanisms by which it prohibits violent or threatening conduct that are not related to protected speech. Laws prohibiting battery, assault, disorderly conduct/breach of the peace, trespassing, and disorderly

intoxication address behavior that is disruptive and harmful to the public without intruding on protected speech.

137.    By depriving individuals of the use of traditional public forums to engage in expressive activity, the Ordinance forces individuals to take their speech to other locations that are less effective channels for communicating protected speech. By doing so, it does not leave open reasonable alternative channels for protected speech. The City continues to enforce the Ordinance to prohibit Plaintiffs and other homeless individuals from engaging in charitable solicitation in traditional public fora.

138.    Plaintiffs have a credible threat of future prosecution under the Ordinance through arrest by the City Police.

139.    The City's enforcement of the Ordinance is the direct and proximate cause of the violations of Plaintiffs' constitutional rights.

140.    Violations of the Ordinance have subjected Plaintiffs to penalties for engaging in protected speech in traditional public fora, and the Ordinance has had a chilling effect on Plaintiffs' constitutionally protected expression.

141.    Plaintiffs have suffered, and continue to suffer, irreparable harm and have been damaged as a direct result of Defendant's enforcement of the Ordinance.

142.    Plaintiffs have suffered damages including emotional distress, fear, humiliation, assessment of financial penalties, loss of liberty, loss of opportunity to request and receive charitable donations, and loss of the constitutional right to engage in protected First Amendment activity.

143.     An injunction is required as damages alone are not an adequate remedy at law. Damages alone cannot adequately compensate Plaintiffs for the ongoing loss of their constitutional rights. Plaintiffs have suffered, and continue to suffer, irreparable harm and have been damaged as a direct result of Defendant's enforcement of the challenged Ordinance.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A.   Issue a preliminary and permanent injunction preventing Defendant from enforcing the challenged provisions of the Ordinance, City Code §§ 66-1(c)(1), 66-1(c)(3) – (4);

B.   Enter a declaration that the challenged provisions of the Ordinance, City Code §§ 66-1(c)(1), 66-1(c)(3) – (4) are unconstitutional both facially and as applied to Plaintiffs by officers, agents, and employees of the City in violation of the First Amendment of the U.S. Constitution;

C.   Award compensatory damages for Plaintiffs against Defendant, including for emotional distress, fear, humiliation, loss of liberty, opportunity to request and receive charitable donations, loss of opportunity to speak, and any other damages as permitted by law;

D.   Award nominal damages for Plaintiffs against Defendant;

E.   Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

F.   Award such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all counts alleged above.

Dated: November 28, 2022                Respectfully submitted,

*/s/ Chelsea Dunn*
**Chelsea Dunn**, Fla. Bar. No. 1013541
Chelsea.Dunn@southernlegal.org
LEAD COUNSEL
**Jodi Siegel**, Fla. Bar No. 511617
Jodi.Siegel@southernlegal.org
**Daniel Marshall**, Fla. Bar No. 617210
Dan.Marshall@southernlegal.org
**Southern Legal Counsel, Inc.**
1229 NW 12th Avenue
Gainesville, FL 32601-4113
(352) 271-8890

**Sabarish P. Neelakanta**, Fla. Bar No. 26623
Sab@spnlawfirm.com
**SPN Law, LLC**
The Harvey Building
224 Datura Street, Suite 904
West Palm Beach, FL 33401
(561) 350-0369

**Paul S. George Jr.,** Fla. Bar No. 1025976*
Paul.George@hklaw.com
**Holland & Knight LLP**
701 Brickell Avenue, Suite 3300
Miami, FL 33131
(305) 877-7584

**ATTORNEYS FOR PLAINTIFFS**

*Application for admission to the Middle District of Florida pending*

30